FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

07 JUL 25 PM 12: 48

| | |
|---|---|
| Biomet, Inc., Biomet Orthopedics, Inc., Biomet Biologics, Inc., f/k/a Cell Factor Technologies, Inc., and Biomet Sports Medicine, Inc., f/k/a Arthrotek, Inc., **Plaintiffs,** v. Randy D. Fields, Fields Medical Corporation, and Fields & Stallings, L.L.C., **Defendants.** | Civil Action No. _____ STEPHEN R. LUDWIG, CLERK US DISTRICT COURT FOR THE NORTHERN DISTRICT Judge: _____ 3:07CV0346 IM |

---

## DEFENDANTS' MOTION TO DISSOLVE EX PARTE TEMPORARY RESTRAINING ORDER AND MEMORANDUM IN SUPPORT

### INTRODUCTION

While this action was in state court, plaintiffs schemed to have an *ex parte* temporary restraining order entered even though: (1) no emergency existed, (2) plaintiffs knew that the defendants were represented by counsel but made no effort to provide notice of the hearing, (3) the ex parte TRO conflicts with an earlier injunction entered by a Kentucky court, and (4) the order was procured based on a series of misstatements. Some of the harm caused by this ex parte TRO will cure itself when the order expires by its own terms, and under the *Granny Goose* doctrine, on July 26, 2007 -- ten days after it was entered. Defendants anticipate, however, the plaintiffs will rekindle many of the same arguments here. As a result, we bring this motion to set the record straight and to confirm that the TRO expires on July 26.

## STATEMENT OF FACTS

### A.    Background on FMC and F&S.

This case is part of a broader scheme by the plaintiffs to undermine defendant Randy

Fields' ability to realize the value from the businesses he worked so hard to build.  In 1989,

Fields created defendant Fields Medical Corporation ("FMC") to act as a distributor of medical

devices to hospitals and physicians.  FMC is based in Louisville, Kentucky.  The primary and

most valuable assets of a company such as FMC are its employees who combine sales ability,

technical expertise, and relationships with the surgeons who use the represented products.

(Verified Complaint filed in *Fields Medical Corp. v. Stallings*, No. 07-CI-006256 (Ky. Cir. Ct.,

July 3, 2007) ("VC"), attached as Exhibit 1, ¶¶ 13-14.)[1]

In 1994, Biomet, an orthopedic device manufacturer, contracted with FMC for FMC to

use its sales associates and their skills and experience to distribute Biomet's products (the

"Biomet Distribution Agreement").  (VC ¶ 16.)  The Biomet Distribution Agreement provides

that FMC is the exclusive Biomet sales representative for a territory that includes portions of

Kentucky, Tennessee, and West Virginia.  (VC ¶ 16.)

In 1997, Fields hired Kirk Stallings to work for FMC as a sales representative.  Stallings

was brand new to this industry, and over the next few years, Fields spent substantial time, effort,

and expense in training Stallings.  Fields promoted Stallings to sales manager and in 2006, at his

request, promoted him to FMC's Vice President of Sales.

In 2003, Fields brought Stallings into Fields & Stallings, LLC. ("F&S"), created to also

act as a distributor of medical devices to hospitals and physicians. (VC ¶ 28.)  At that time, Cell

---

[1] For purposes of supporting requests relating to temporary restraining orders, a verified
complaint, which verifies under oath the factual assertions made in the complaint, has the same
effect as an affidavit. *See, e.g.* Fed. R. Civ. P. 65(b) (requiring restraining order motion to be
supported "by affidavit *or* by the verified complaint") (emphasis added).

Factor Technologies, Inc. a Biomet subsidiary, now known as Biomet Biologics, Inc. ("Cell Factor"), contracted with F&S for F&S to use its sales associates and their skills, experience, and customer relationships to distribute Cell Factor's products. (VC ¶ 28.) Fields owns 51% of the membership interests of F&S. Stallings owns the other 49%. F&S is based in Louisville, Kentucky.

In 2005, Arthrotek, Inc., a Biomet subsidiary now known as Biomet Sports Medicine, Inc. ("Arthrotek"), contracted with F&S for F&S to use its sales associates and their skills, experience, and customer relationships to distribute Arthrotek's products. (VC ¶ 29.) The Cell Factor and Arthrotek distribution agreements each provide that F&S has an exclusive representation territory which includes portions of Kentucky, Tennessee, and West Virginia. (VC ¶¶ 28-29.)

## B.    The Employment Contracts Between FMC/F&S and Their Employees.

Stallings and nearly all of FMC's and F&S's sales associates have written employment contracts with either FMC or F&S, all of which contain non-competition covenants in favor of FMC or F&S, as the case may be. (VC ¶¶ 23, 31.) None of the sales associates currently has, or has ever had, employment contracts directly with Biomet, Cell Factor, or Arthrotek. (*See* copies of Affidavits of Chaye Hart ("Hart Aff.") ¶ 5 and Greg Mays ("Mays Aff.") ¶ 6, attached hereto as Exhibits 2 and 3.)[2]

These agreements are vital. FMC's and F&S's relationships with health care and surgical facilities and individual surgeons are critical to their business of medical product distribution. (VC ¶ 30.) FMC and F&S have spent years and substantial sums of money to develop these relationships and to train the employee sales associates, including Stallings, to sustain these

---

[2] The original affidavits were filed in conjunction with defendants' Motion for Restraining Order in *Fields Medical Corp. v. Stallings*, No. 07-CI-006256 (Ky. Cir. Ct., July 3, 2007).

- 3 -

relationships.  These relationships and the companies' goodwill with their customers and their associates are FMC's and F&S's primary assets and are crucial to operating a successful medical product distribution business.

**C.      Fields and Stallings Grow Disillusioned With Biomet and Decide to Negotiate a Sale of FMC/F&S to Zimmer.**

In November 2006, Biomet informed its distributors that it was pursuing a transaction with a private equity group with the goal of converting from a publicly owned corporation to a private corporation.  The distributors were told that the distributors would be expected to execute new distributor agreements. On January 31, 2007, Biomet presented FMC with a new distribution agreement for its review and consideration. Stallings and Fields discussed the renegotiation of the Biomet Distribution Agreement on several occasions and they agreed to leave their options open.

Biomet's proposal contained many provisions and features which were objectionable and disadvantageous to Stallings' and Fields' businesses.  (VC ¶¶ 34-36.)  As a result, Fields and Stallings explored the possibility of selling their businesses to Zimmer, a leading manufacturer of orthopedic implants and a competitor of Biomet.

On June 14, 2007, Stallings and Fields, as the only members of F&S, signed a Unanimous Written Consent resolving to enter into the Asset Purchase Agreement and related documents with Zimmer.  In a closing beginning on June 14, 2007 and concluding on June 15, 2007, Stallings and Fields entered into employment agreements with one of Zimmer's distributors, Zimmer Melia & Associates, Inc. ("Zimmer Melia").  (VC ¶ 49.)  These employment agreements are for four year terms, and contain annual renewal options thereafter. Their employment will begin only after the existing non-compete obligations to Biomet expire.

- 4 -

(VC ¶ 50.)  The execution and delivery of these employment agreements by Stallings and Fields was a material condition of the sale to Zimmer.  (VC ¶¶ 45-46.)

Under the Asset Purchase Agreement, only a portion of the purchase price for FMC's and F&S's goodwill was to be paid at closing.  (Asset Purchase Agreement, attached to Plfs.' First Am. Compl. as Exhibit E, § 3.1.)  The remainder of the purchase price for FMC's and F&S's goodwill was to be made through the Earn-Out and Overachievement Payments.  (Asset Purchase Agreement §§ 3.2 and 3.3.)  (VC ¶¶ 43-44.)  In order to maximize the Earn-Out and Overachievement Payments due to FMC and F&S for the purchase of their goodwill, Fields and Stallings would have to devote their full efforts to selling Zimmer products for Zimmer Melia. In addition, Zimmer Melia would have to employ as many FMC and F&S employees as possible. (VC ¶¶ 44-45.)

On June 15, 2007, FMC and F&S held a regularly scheduled sales meeting with the companies' sales associates.  At this meeting, it was announced to the sales force that the assets of FMC and F&S were being sold to Zimmer.  Representatives of Zimmer were available to discuss employment relationships with them.  Later, the sales associates did meet with representatives of Zimmer and Zimmer Melia, resulting in approximately 35 sales associates signing employment contracts with Zimmer Melia.  (VC ¶¶ 53-55.)

**D.      Biomet Induces Stallings to Breach His Contracts and His Duties to Become the New Biomet Distributor.**

On Friday, June 15, 2007, termination notices were sent to Biomet, Arthrotek and Cell Factor by FMC and F&S in accordance with the various distribution agreements.  On the evening of Saturday, June 16, 2007, Fields received an unsolicited call from Joe Coen, Biomet Vice-President of Sales. Within minutes, Biomet executives were at Fields' home, trying to convince him to abandon his contract with Zimmer and sign with Biomet.  (VC ¶¶ 56-58.)  They offered

- 5 -

several packages to try to entice Fields to repudiate the deal he had just signed with Zimmer, including funds to entice his sales associates to return to Biomet and a cash payment to him.

Late on the evening of Monday, June 18, 2007, Stallings and Fields jointly concluded that they would not violate their agreements with Zimmer or Zimmer Melia. Stallings further stated that he would agree to whatever decision Fields made on the matter.

Biomet then began offering huge amounts of money to Stallings *personally*, and not to the companies, to induce him to breach the agreements. (VC ¶ 68.)  On Tuesday, July 19, 2007, unbeknownst to Fields, Stallings caused the organization of a Kentucky limited liability company under the name Stallings & Associates, LLC, for the purpose of competing directly with FMC, F&S and Zimmer Melia. (VC ¶ 70.)  On June 19, 2007, Stallings informed Fields that Stallings had decided to breach and abandon his contract with Zimmer Melia and join Biomet. (VC ¶ 69.)  To Fields's surprise, Stallings exclaimed to Fields, "What would you do in my situation? They are offering me $5 million!"  Stallings has been appointed as the Biomet distributor for the territory that FMC served. (VC ¶ 74.)

E.    **Stallings, With Biomet's Full Cooperation, Attempts to Induce FMC and F&S Employees to Breach Their Contracts.**

Stallings, in concert with Biomet representatives, immediately started contacting FMC's and F&S's sales associates to try to entice them into repudiating their contracts with Zimmer Melia. (VC ¶ 75; Mays Aff. ¶ 9; Hart Aff. ¶¶ 6-7.)  Stallings has offered contracts with his new company to FMC and F&S sales associates.  Stallings has assured the companies' sales associates that if they cannot work for two years because of the non-competition provision in their contracts with Zimmer, Biomet will pay them their last year's salary for those two years. (VC ¶¶ 71-73; Hart Aff. ¶ 11; Mays Aff. ¶16.)  Stallings made a variety of other representations to induce these employees to dishonor their obligations to Zimmer Melia.

- 6 -

On or about June 21, 2007, Biomet sent a letter to a wide range of surgeons in the territory covered by FMC and F&S touting Stallings and announcing that he would be the new Biomet distributor for the territory.  (VC ¶ 74.)  The letter also made numerous disparaging remarks about Zimmer and Fields.  (A copy of this letter is attached to VC as Exhibit H.)

**F.      Fields Sues Stallings In Kentucky State Court And Obtains An Injunction.**

To stop the underhanded actions of Biomet and its accomplice, Stallings, Fields and his companies brought suit in Kentucky state court on July 3 and moved for a restraining order against Stallings.  After providing notice to all parties, the Kentucky court held a hearing on Fields' motion for a restraining order on July 5.  Stalling was represented by counsel.  An attorney from the Freeborn & Peters firm, which represent plaintiffs in this action, attended the restraining order hearing.  The court heard arguments, considered the evidence, and received additional submissions from the parties.  The court took the matter under advisement and issued its order on July 12, enforcing the terms of Stallings' non-compete and enjoining him from competing against Fields' companies.  (A copy of the order is attached as Exhibit 4.)

**G.      Biomet Retaliates With An Ex Parte TRO In Indiana State Court Against Fields and His Companies**

Stung by the Kentucky court's actions, plaintiffs retaliated by filing a separate suit against Fields and his companies in the Kosciusko County Superior Court on July 16.  Actually, plaintiffs filed their first complaint against Fields and his companies in that court on July 5, 2007.  Belying any later claim of emergency, however, plaintiffs let that complaint languish.  They did not seek injunctive relief to protect themselves against any supposed immediate harm.  Instead, only *after* the Kentucky court entered its restraining order did plaintiffs amend their complaint to make it verified and move for a TRO.  Approximately ten minutes before plaintiffs

- 7 -

secured the signature of a Kosciusko County judge on the TRO order that they drafted, plaintiffs faxed their Amended Complaint and TRO papers to Fields' business number.

Based on the papers that were filed, there is no evidence that plaintiffs ever advised the state court judge: (1) that plaintiffs knew full well the identify of counsel who were representing Fields, or (2) that plaintiffs' proposed TRO conflicted with the earlier Kentucky order. Unadvised of these facts, and without notice to Fields or his counsel, the Indiana judge entered the TRO prepared by plaintiffs.  Among other things, the Indiana TRO precludes FMC or F&S from enforcing their non-compete agreements with their former employees who sold plaintiffs' products.

## ARGUMENT

**A.    The TRO Expires On July 26, 2007 Under Either the Indiana Rules of Procedure or The Federal Rules of Civil Procedure.**

In *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Local 70*, 415 U.S. 423 (1974), the United States Supreme Court clearly addressed how a state court temporary restraining order should be treated after the underlying case is removed to federal court. "The Federal Rules of Civil Procedure, like other provisions of federal law, govern the mode of proceedings in federal court after removal." *Id.* at 438.  Under federal law, ex parte restraining orders are disfavored. "The stringent restrictions imposed by" Fed. R. Civ. P 65 on the availability of ex parte temporary restraining orders "reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and opportunity to be heard has been granted to both sides of a dispute." *Id.* at 439.  To safeguard against "ill-considered injunctions without notice," the *Granny Goose* Court adopted this rule: an ex parte temporary restraining order issued by a state court before removal remains in force after removal

- 8 -

"no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b)." *Id.* at 338-340.

Here, no complicated counting is required nor is there any need to harmonize competing rules because the Indiana Rules on the length of ex parte restraining orders directly track the Federal Rules.  Under either Indiana Rule 65 or Fed. R. Civ. P. 65, an ex parte restraining order expires ten days after it is entered.  Ind. R. of Trial P. 65(B)(2) ("Every temporary restraining order granted without notice . . . shall expire by its terms within such time after entry, not to exceed ten [10] days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period . . . .");  Fed R. Civ. P. 65 (same).  The *ex parte* order was entered by the state court on July 16.  Under the Indiana Rules and the rule adopted in *Granny Goose*, this order expires on July 26, 2007.

## B.     The State Court TRO Was Ill-Advised and Ill-Considered.

As *Granny Goose* and other cases make clear, our system of justice frowns on ex *parte* orders.  Orders entered without notice to the opposing party offend basic notions of fairness and are reserved only for true emergencies.  Here, no such emergency existed.  Plaintiffs knew exactly who defendants' counsel was; they had been corresponding for weeks.  Plaintiffs easily could have reached defendants' counsel to give notice of the TRO hearing by phone, fax, or e-mail (and, indeed, had done so for other purposes shortly before and after the TRO was entered), but plaintiffs did not even bother trying.  This lack of good-faith effort to notify known counsel for a party before seeking a TRO is a misuse of the TRO process.

Moreover, under the Federal Rules of Civil Procedure, which now govern this case, a TRO may be entered only to prevent "immediate and irreparable injury, loss, or damage [that] will result to the applicant before the adverse party or that party's attorney can be heard in opposition . . . ."  Fed. R. Civ. P. 65(b).  Plaintiffs have known since June 15, 2007 that FMC and

- 9 -

F&S were terminating their distribution contracts with plaintiffs.  Plaintiffs filed a complaint back on July 5 but did nothing to seek injunctive relief until *after* the Kentucky court entered its order restraining Stallings flouting his contractual obligations for the benefit of plaintiffs.

Plaintiffs also blended their and defendants' distinct identities and blurred the facts to create the illusion of immediate harm where none existed.  Plaintiffs' claims are based, in large part, on the "best efforts" contract provisions.  But those provisions do not survive the contracts' termination, which occurred one day *before* plaintiffs filed their amended complaint and obtained the TRO.  Plaintiffs' claims are also based on defendants' supposed "no hire" obligation.  But that obligation is owed by only one defendant to only one plaintiff, and it only prohibits that defendant from hiring that plaintiff's employees.  That obligation does not interfere with any defendants' ability to interact with its own employees, which is the only issue here.  And it certainly does not support a sweeping injunction in favor of all plaintiffs against all defendants.

Plaintiffs appear to have convinced the state court that an injunction was needed to protect plaintiffs' (and doctor and patient) access to surgical instruments.  But plaintiffs concealed the fact that three days before they filed their amended complaint and TRO motion, Biomet reacquired all the instruments.

Plaintiffs represented to the state court that defendant Fields was going to work for a competitor.  Plaintiff Biomet failed, however, to mention that Fields' employment contract and his incentive program do not kick-in until after his non-compete obligations owed to Biomet expire.

Plaintiffs pleaded (in a *verified* complaint, no less) that defendants owed fiduciary duties to plaintiffs "[b]y virtue of being the agents of" plaintiffs.  But two of the three contracts between

- 10 -

plaintiffs and defendants – which were drafted by plaintiffs – *explicitly disclaim* any agency relationship. And the third contract effectively does the same by prohibiting defendant FMC from transacting any business or making any promise on Biomet's behalf.

For all these reasons, no immediate harm to plaintiffs was threatened. The state court TRO was improvidently entered. This Court should not give its imprimatur to that order by maintaining it.

**1.      Plaintiffs improperly failed to give defendants' counsel notice of the TRO hearing.**

Despite having had a complaint on file since July 5, plaintiffs gave only a few minutes notice of their TRO application by faxing a copy of their amended verified complaint and TRO motion papers to Fields' business office. Plaintiffs made no attempt whatsoever to contact defendants' counsel so they could be heard on the TRO motion.

Plaintiffs knew full well that defendants represented by counsel with respect to the issues raised in plaintiffs' complaint. On June 19, 2007, defendants' Kentucky counsel sent an e-mail to, among others, Robert Hall, Biomet's general counsel, stating that "the legal counsel listed below represent [FMC], [F&S], and Randy D. Fields with respect to any and all matters involving Biomet Orthopedics, Inc. and/or its affiliates . . . ." (A copy of this e-mail is attached hereto as Exhibit 5.) Over the next few weeks, lawyers from plaintiffs' outside counsel in this case, Freeborn & Peters, sent several letters to defendants' Kentucky counsel raising issues on behalf of Biomet and the other plaintiffs in this case. (Three of these letters are attached hereto as Exhibits 6, 7, and 8.) Thus, plaintiffs undeniably knew who represented defendants and knew how to reach defendants' counsel. There simply is no excuse for plaintiffs' failure even to attempt to give notice of the TRO hearing to defendants' counsel.

- 11 -

> **2.** **The Indiana TRO was procured based on misrepresentations of the governing contracts, particularly as they related to alleged "best efforts" and non-solicitation obligations.**

> a.    The Best Efforts Clause Cannot Support Injunctive Relief.

In procuring the TRO, plaintiffs created the misimpression that Fields owed continuing "best efforts" obligations to the Biomet entities and that he was breaching those obligations. (Plfs.' First Am. Compl. ¶¶ 1, 68-72.) The "best efforts" clause, however, in the Arthrotek contract applies only "[d]uring the term of this relationship." (Arthrotek Contract, attached to VC as Exhibit D, p. 3, § 5(d)) "It is understood and agreed that . . . Distributor may terminate this relationship by giving . . . thirty (30) days' written notice of termination." (*Id.*, p. 2, § 5.) According to the complaint, F&S gave written notice of termination on June 15, 2007, which made the termination effective on July 15, 2007. (Plfs.' First Am. Compl. ¶ 5.) Plaintiffs' Verified First Amended Complaint was filed, and the TRO entered, on July 16, 2007. Thus, the "best efforts" provision had already expired and could not be the basis for an injunction to prevent "future" breaches by defendants or "future" harm to Arthrotek.

There is no specific "best efforts" provision in the Cell Factor contract. The "Scope" section (Cell Factor Contract, attached to VC as Exhibit C, p. 1, § 1) says that F&S will use its "best efforts" to promote the sale of" Cell Factor's products, but that obligation is necessarily limited to the duration of the agreement. The Cell Factor contract allowed F&S to "terminate this relationship immediately without prior notice of such termination to the other party." (*Id.*, p. 2, § 5.) Thus, the "best efforts" provision in that contract expired upon F&S's termination of that contract, effective July 15, 2007.

The "best efforts" clause in the Biomet contract applies only "[d]uring the term of our relationship." (Biomet Contract, attached to VC as Exhibit B, p. 2, § (d).) "It is agreed and understood that [FMC] may terminate this relationship, with or without cause, by giving . . .

- 12 -

thirty (30) days' written notice of termination." (*Id.*, p. 2.)  According to the complaint, FMC gave written notice of termination on June 15, 2007, which made the termination effective on July 15, 2007.  (Plfs.' First Am. Compl. ¶ 5.)  The Verified Complaint was filed, and the TRO entered, on July 16, 2007.  Thus, the "best efforts" provision had already expired and could not be the basis for an injunction to prevent "future" breaches by defendants or "future" harm to Biomet.

The supposed "best efforts" contractual obligation provide no support for the state court's TRO.

          b.      The "No Hire" Clause Cannot Support Injunctive Relief.

To obtain the TRO, Biomet falsely suggested that all defendants were precluded from playing any role in arranging for former FMC and/or F&S employees to go to work for a Zimmer distributor.  (Plfs.' TRO Motion at 9, 11.)  In reality, there is no "no hire" clause in the Biomet contract.  FMC's only contract is with Biomet.  Thus, FMC cannot be bound by a "no hire" clause, and there is no basis for an injunction against FMC on this ground.  Likewise, there is no "no hire" clause in the contract between F&S and Cell Factor.

The "no hire" clause appears only in the Arthrotek contract with F&S.  It prohibits F&S and Randy Fields from (a) "directly or indirectly . . . induc[ing] or attempt[ing] to induce any employee to terminate his employment with Arthrotek or Arthrotek's successors, affiliates, and/or subsidiaries," or (b) "recruit[ing], solict[ing], entic[ing], or tak[ing] away or assist[ing] others in recruiting, soliciting or hiring any person who is, or within the preceding one (1) year was an employee, representative, or consultant for Arthrotek or Arthrotek's subsidiaries, successors and/or affiliates."  (Arthrotek Contract, p. 5, § 8.)

The "(a)" portion of the clause cannot apply here.  It is limited to people having "employment with Arthrotek or Arthrotek's successors, affiliates, and/or subsidiaries."  The sales

BDDB01 4831785v1

associates at issue had employment contracts only with F&S.  The Arthrotek contract states that "Distributor represents and acknowledges that it is an independent contractor and *not an employee of Arthrotek.*"  (*Id.*, p. 2, § 2.)  Certainly, then, Distributor's employees are not Arthrotek employees.

The "(b)" portion of the clause also cannot apply here.  It covers only recent "employee[s], representative[s], [and] consultant[s]" for Arthrotek and related companies.  As explained above, the F&S sales associates were not employees of anyone but F&S.  They did not consult (and Biomet does not allege that they consulted) for Arthrotek or any affiliated company.

Thus, this sub-clause applies only if the F&S sales associates were "representatives" of Arthrotek; and they were not.  The contract refers to F&S as a "commission sales representative of Arthrotek."  (*Id.*, p. 1, § 1.)  The contract refers to the people working for F&S as "Distributor's sales associates."  (*Id.* p. 3, § 5(b); *see also id.*, p. 3, § 5(d) (referring to Distributor's "employees, sales associates, or independent contractors").)  The contract never refers to them as Arthrotek's representatives.  If the sub-clause did apply to the F&S sales associates, it would effectively prohibit F&S from hiring its own employees – an absurd construction, to say the least.  The contract states that "neither [F&S] nor any of its agents or employees will have any right or authority to assume or create any obligation of any kind, whether express or implied on behalf of Arthrotek."  This is not the stuff of which an Arthrotek "representative" is made.

But even if this provision did apply, as plaintiffs contend, it would apply only in favor of plaintiff Arthrotek against defendant F&S.  The state court's TRO, however, was entered in favor of *all* plaintiffs against *all* defendants in this regard.  (TRO, attached hereto as Exhibit 9,

- 14 -

¶ (e).)  What's more, F&S only had a small number of employees by comparison to FMC.  Thus, the TRO, if not entirely invalid, is at least untenably broad.

c.    <u>The Instrument Issue Is A Red-Herring</u>.

To obtain the TRO, plaintiffs raised a fuss about surgical instruments that were allegedly not being returned.  (Plfs.' First Am. Compl. ¶¶ 31, 55-56.)  The instruments cannot really be that important to plaintiffs, otherwise plaintiffs would retain ownership and not sell them to distributors who have "at-will" termination rights.  Indeed, the Arthrotek contract expressly states that "Distributor is under no obligation to sell Distributor's instruments back to Arthrotek." (Arthrotek Contract, pp. 6-7, § 15.)  Neither the Biomet nor the Cell Factor Contract requires FMC or F&S to sell back its instruments.

In a July 13 letter – three days before the Verified Complaint was filed and the TRO was entered – plaintiffs' counsel acknowledged that Zimmer had sold the instruments back to Biomet.  (July 13, 2007 letter from William Howard to Thomas Rutledge, attached hereto as Exhibit 8.)  Thus, any concerns about Zimmer removing the instruments from the marketplace to harm plaintiffs had already been allayed.

Plaintiffs' verified assertion that "the only reason Zimmer could have wanted to buy [the instruments] is to take them out of service" (Plfs.' First Am. Compl. ¶ 6) is not only proven false by Zimmer's willingness to sell the instruments back to Biomet, but also by Biomet's next sentence: "Fields still owes Biomet over $1 million for those instruments . . . ." (*Id.*)  Surely, if Fields was going to agree to terminate his relationship with Biomet, he would need to recoup his sunk costs (and extinguish his debts) relating to that former business.  Zimmer's purchase of the instruments merely made Fields whole and, thus, made the idea of ending his relationship with Biomet palatable.

- 15 -

d.    That Any Former FMC/F&S Sales Associates May Be Working For Zimmer And/Or Competing With Biomet Is Irrelevant.

Biomet, Arthrotek, and Cell Factor did not have any contractual relationships with FMC's or F&S's sales associates. Therefore, they had no enforceable non-competition agreements with those sales associates.

The thirty-day termination notice requirements in the Biomet and Arthrotek contracts, and the "best efforts" provisions in all three contracts, required FMC and F&S to maintain their sales force for thirty-days after the June 15 notice of termination. All the contracts that the FMC and F&S employees entered into with Zimmer Melia, however, did not become effective until the thirty-first day thereafter. Thus, the new Zimmer Melia contracts did not violate any obligations owed to Biomet.

e.    Biomet Grossly Overstates Its Interest In FMC/F&S's Property Rights.

In paragraph 58 of the complaint, plaintiffs complain that FMC and F&S sold their telephone numbers to Zimmer. FMC and F&S owned those telephone numbers and were free to sell them. All three contracts state that FMC/F&S are independent contractors.

The complaint was filed after the termination of FMC/F&S's relationship with Biomet, Arthrotek, and Cell Factor became effective. Thus, even if the sale of these numbers to Zimmer had violated some duty that FMC/F&S owed to plaintiffs during the term of that relationship, that violation could not support an injunction to prevent "future" breaches by defendants or "future" harm to any plaintiff.

There is no allegation that, while the relationship between FMC/F&S and Biomet, Arthrotek, and Cell Factor still existed, FMC/F&S failed to use anything other than their best efforts on behalf of plaintiffs to service any customer who called those numbers looking to buy plaintiffs' products.

- 16 -

In paragraph 83 of the complaint, plaintiffs allege that all of FMC and F&S's goodwill belongs to Biomet. "Enterprise goodwill is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers, and suppliers, and may include factors such as business location, its name recognition and its business reputation." *DeSalle v. Gentry*, 818 N.E.2d 40, 47 (Ind. App. 2004). FMC/F&S had their own goodwill. FMC/F&S recruited, hired, and trained its own employees, the sales associates; plaintiffs didn't. FMC/F&S and its employees had daily, face-to-face contact with its customers; plaintiffs didn't. FMC/F&S selected and owned their business location. If plaintiffs' products sold themselves, then plaintiffs wouldn't have needlessly paid millions of dollars in commissions to FMC/F&S.

Plaintiffs' primary contributions to FMC/F&S's businesses were the products and the "Biomet," "Arthrotek," and "Cell Factor" names. FMC/F&S sold to Zimmer, and Zimmer bought from FMC/F&S, none of those things. Thus, everything Zimmer bought from FMC/F&S belonged to FMC/F&S; plaintiffs are not entitled to any of those proceeds.

Congress, state legislatures, and courts have recognized that, in supplier-distributor or franchisor-franchisee relationships, the distributor/franchisee "develop[s] goodwill" that is protectable as against the supplier/franchisor. *See, e.g., Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1220 (7th Cir. 1982) (observing that Petroleum Marketing Practices Act is intended to "prevent . . . the appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern"). Here, all three contracts expressly disclaim any franchise relationship and expressly state that FMC/F&S are independent contractors, which only strengthens the argument that FMC/F&S's goodwill is their own.

- 17 -

f.   Biomet Omits Any Reference To The Waiting Periods Built Into Fields' Contract With Zimmer Melia And The APA.

In paragraphs 59 and 60, plaintiffs say that Fields "agreed to go work for Zimmer selling Zimmer products" (citing the Asset Purchase Agreement) and "will be distributing Zimmer products in the same geographic location in which he distributed Biomet products." (Citing Fields' Sales Associate Employment Agreement with Zimmer Melia). Plaintiffs neglected to inform the Kosciusko County Court that Fields will not be working for any Zimmer related entities until after his non-compete obligations with Biomet expire. Under the Asset Purchase Agreement, the "Earn-out" and "Overachievement" payment provisions do not kick in until mid-2008 – after Fields' non-compete provision with Biomet expires. (Asset Purchase Agreement § 3.2 & Schedule 3.2(a).) Similarly, under the Sales Associate Employment Agreement with Zimmer Melia, Fields' employment does not become effective until 2008 – after Fields' non-compete provision with Biomet expires.

g.   Fields Did Not Sell To Zimmer, And Zimmer Did Not Acquire, Any Biomet Confidential Information.

In paragraph 58, plaintiffs allege that "Fields also sold to Zimmer Biomet's customer lists, customer information, [and] customer account files . . . ." But the Asset Purchase Agreement recognizes that "Biomet contends that certain information is confidential and proprietary to Biomet. All confidential and proprietary Biomet information will be returned by Sellers to Biomet at the time that Sellers terminate the Distributor Agreements with Biomet." (Asset Purchase Agreement § 1.2.) Thus, Fields has scrupulously avoided transferring any confidential information to Zimmer.

h.   FMC/F&S Were Not Biomet's Agents.

In paragraph 107, and as the basis for Count IX – Breach of Fiduciary Duty, plaintiffs alleges that Fields, FMC, and F&S were "agents of Biomet." Yet, the Arthrotek contract states:

- 18 -

"The Distributor will not be deemed an agent of Arthrotek for any purpose whatsoever."
(Arthrotek Contract, p. 2, § 2.)   The Cell Factor contract states:   "Distributor will not be deemed
an agent of CFT for any reason whatsoever . . . ."   (Cell Factor Contract, p. 1, § 2.)

The Biomet contract does not expressly state that FMC is not an agent, but it does state
that FMC is an "independent contractor" and is "not authorized to transact business, incur any
obligations in the name of or for the benefit of Biomet, nor on Biomet's behalf make any
promise, warranty or representation with respect to Biomet . . . ."   (Biomet Contract, p. 1.)   Here
again, plaintiffs created a false impression with the Indiana state court to serve the momentary
goal of obtaining an *ex parte* TRO.

### 3.      The Indiana Ex Parte TRO Conflicts With the Earlier Kentucky Order.

The Indiana TRO conflicted with the Kentucky restraining order, an order that remains in
effect.   Under the Kentucky order, Stallings is required to honor the terms of his non-compete
with FMC.   (July 12, 2007 Order, Exhibit 4, ¶¶ 1-4.)   By contrast, the very first provision of the
Indiana TRO purports to prevent Fields from enforcing "FMC or F&S's non-compete
agreements with their former employees who marketed, promoted or sold Arthrotek, Cell Factor
or Biomet products."   (TRO ¶ (a).)   Stallings is a former FMC employee and, therefore, the
literal language of the TRO suggests that Fields could not enforce the Kentucky injunction
against Stallings.

Now that this Court has jurisdiction, however, the Anti-Injunction Act prohibits an
injunction that would effectively prevent defendants from enforcing their previously-obtained
Kentucky injunction.   28 U.S.C. § 2283 (prohibiting federal court from "grant[ing] an injunction
to stay proceedings in a State court"); *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive
Engineers*, 398 U.S. 281, 287 (1970) ("It is settled that the prohibition of section 2283 cannot be

- 19 -

evaded by addressing the order to the parties or prohibiting utilization of the results of a completed state proceeding.")  This is just another reason why the Court should not continue the state court TRO order.

## **CONCLUSION**

The Indiana *ex parte* TRO expires on July 26.  The Court should reject any attempts by plaintiffs to extend that ill-advised order.

Dated: July 25, 2007                        Respectfully submitted,

Steven L. Jackson (#4861-02)
Shannon K. Reed (#22591-64)
David D. Storey (#23764-41)
BAKER & DANIELS LLP
111 E. Wayne Street, #800
Fort Wayne, IN  46802
Telephone:  260-424-8000
Facsimile:  260-460-1700

Attorneys for Defendants
Randy D. Fields, Fields Medical Corporation,
and Fields & Stallings, L.L.C.


Edward J. Sebold
Dennis L. Murphy
Pearson N. Bownas
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio   44114
Telephone: (216) 586-3939
Facsimile:  (216) 579-0212

Attorneys for Defendants
Randy D. Fields, Fields Medical Corporation,
and Fields & Stallings, L.L.C.

(Applications for *pro hac vice* admission for
the three Jones Day attorneys above are
pending with the court.)

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2007, a copy of the forgoing Notice of Removal was

served, via regular U.S. mail, postage prepaid, on the following:

> Stephen R. Snyder
> SNYDER, BIRCH & MORGAN, L.L.P.
> 200 West main Street
> Syracuse, Indiana 46567
>
> -and-
>
> William N. Howard
> Kellye L. Fabian
> FREEBORN & PETERS, L.L.P.
> 311 South Wacker, Suite 3000
> Chicago, Illinois 60606
>
> **Attorneys for Plaintiffs Biomet, Inc., Biomet Orthopedics, Inc.,
> Biomet Biologics, Inc., f/k/a Cell Factor Technologies, Inc., and
> Biomet Sports Medicine, Inc., f/k/a Arthrotek, Inc.**